Thank you. Can I just get my cell phone? You may proceed. Good morning. Good morning. If the Court please, my name is Alan Cooper. I am counsel for the Appellant American Circuit Breaker Corporation. Your Honors, this case involves a fundamental misapplication of substantive law. This is a conventional trademark infringement case. American Circuit Breaker, the appellate, owns the register trademark STABLOK, S-T-A-B-L-O-K, for circuit breakers in the United States. A Canadian company, Federal Pioneer Limited, owns that same trademark in Canada. This is a classic illustration of the principle of the territoriality of trademark rights. Trademark rights are created under the laws of each country, so it is perfectly appropriate for two different companies to own the identical trademark in two different countries. However, with all due respect, the district court in this instance ignored the principle of territoriality of trademark rights, and erroneously applied principles that relate to gray market products, not to conventional infringement situations. A gray market situation is one where the same entity or different parts of the same entity own the same trademark in the United States and other countries, and products bearing those two marks are sold in competition in the United States. The district court correctly found that American Circuit Breaker owns an incontestable Federal registration of the trademark STABLOK. That incontestable registration under Section 15 of the Trademark Act, as a matter of law, creates a conclusive right, conclusive evidence of American Circuit Breaker's exclusive right to use STABLOK in the United States. American Circuit Breaker does not have any legal right to control the nature and quality of the STABLOK Circuit Breakers that Federal Pioneer sells in Canada. It does not have any legal right to do that. It, in fact, does not do that. An important part of this case is an agreement that was entered into in 1993. Before 1993, American Circuit Breaker produced STABLOK Circuit Breakers at its plant in North Carolina. Could you stop for one second? Yes, of course. You said that American Circuit Breaker doesn't have any authority to oversee the manufacturing of the product that's being distributed by the Canadian companies. In Canada. In Canada. There are two different products. I understand. There's the gray and the black. The gray and the black. That's the easiest way to distinguish. That's how I think of them. So you're saying that they don't have any authority over the black? No, the gray. The gray. The gray are the Canadian breakers produced by Federal Pioneer for sale in Canada, where Federal Pioneer owns the trademark STABLOK. Right. American Circuit Breaker, as a matter of the agreement, controls the nature and the quality of the black Circuit Breakers that Federal Pioneer produces for sale in the United States and other countries, but not Canada. Okay. Now, that second point that you're saying that they do exercise control over the black Circuit Breakers and the quality, et cetera, is that point essential to your appeal? No. Because that's the point that you've said there's actual issue on, according to your stipulation. The question of the contract provides that the black Circuit Breakers are to be manufactured by Federal Pioneer according to American Circuit Breaker's standards. The question of whether or not those standards are exercised in any appropriate way really is irrelevant to the disposition of this case, even though it is a contested issue, because these products have two different sources. The source of the U.S. product is American Circuit Breaker because it owns the trademark here. The source of the Canadian product is Federal Pioneer. It owns the trademark there. Source identifies ownership of the trademark and ownership of the goodwill symbolized by the trademark. It does not imply the physical place of manufacture. This Court made that very clear in the Monte Carlo case, which the Oregon Breakers relies on. There the Court said in a reading, the goods sold by Daewoo were not, and that's the defendant, were not imitations of Monte Carlo shirts. They were genuine product planned and sponsored by Monte Carlo and produced for it on contract for future sale. The shirts were not altered or changed from the date of their manufacture to the date of their sale. And this is the critical point. The Court states that their source was Monte Carlo. The source is the owner of the trademark and not the literal place, the identity of the company that produces the products. A typical example would be Nike. To my knowledge, Nike is the largest manufacturer of athletic footwear in the world. It does not own a factory anywhere. All of its products are produced by subcontractors according to its specifications, yet Nike owns the trademark, Nike, and has successfully enforced that many times. So ownership of the trademark identifies, signifies source, not the place of manufacture. And the district court could use that. I think we understand that. But then there this does have some patina of a gray market situation. And this is where I'm trying to work myself around to distinguishing it, whether it is really just a pure trademark infringement case or whether it is gray market because of these stipulations about the genuineness. I mean, basically, each of these circuit breakers, gray and black, is deemed to be a genuine product, correct? Genuine product, as genuine was defined in the district court's opinion, which says essentially that there is no material difference. The reason that American Circuit Breaker entered into that stipulation is that it provided conclusive evidence of an uncontested fact that the products are essentially the same, which is one of the factors that's considered under the sleek craft analysis in an infringement. It's one of the eight confusion factors, the competitive relationship or proximity of the products. This establishes that factor to a fairly well. The literal meaning of genuine in the district court's opinion is no material difference. To attribute to that a legal meaning in a gray market context we submit is error. We stipulate it to a fact, not an irrelevant legal conclusion. Okay. So just so I get it straight, what you're basically saying is under the traditional trademark analysis of whether there's confusion as to source, that the confusion is enhanced because the articles are basically indistinguishable. So it's not a question of somebody thinking, well, it could be from you, but it might be from somebody else. They think, of course, it's from you because it's exactly the same. This is a per se case of infringement as defined in this Court's decision in the Entrepreneur case, which is referred to in our brief. You have the identical trademark, Stablock, used on virtually indistinguishable products. The only difference is the color black and the color gray in the casing. It is a per se case of infringement. It's difficult to imagine a more clear-cut case. And we respectfully submit that the district court wandered off into the world of gray market products. So if you took your product to Canada, then it would be indistinguishable and would be a violation of or potential violation of Canadian trademark law. I have no doubt that it would be a violation of Canadian trademark law. Just to sum up, before 1993, American Circuit Breaker made these products in its plant in North Carolina, sold them in the United States. Federal Pioneer made the products in Canada where it sold them. And you have this dual distribution pattern because you had two different companies owning the same trademark in two different countries. They entered into an agreement in 1993 under which Federal Pioneer agreed to produce the black Circuit Breakers for American Circuit Breaker, but according to American Circuit Breaker's specifications. And in recognition of that ownership right, Federal Pioneer agreed not to sell the gray Stablock Circuit Breakers in the United States. And, indeed, the record shows that periodically it has sent out notices to its client not to export to the United States. Now, the agreement does provide that upon its expiration, which has now been extended until the end of 2006, that American Circuit Breaker will assign its rights in Stablock and other trademarks to Federal Pioneer. However, I respectfully submit that until that event occurs, American Circuit Breaker retains every element of ownership, including the exclusive right to enforce these marks. It's no different than, Your Honor, if I agreed to sell you 40 acres of prime timberland 10 years from now. In the interim, I would have the right to, if someone came in to. Who's the registered trademark holder, AACBC? Yes, ma'am. But in my analogy, if someone came in and cut timber before I assigned it, I still would have a cause of action for the wrongful appropriation of my property. It's my property until I sell it, and that's the situation that we have here. The simplicity of it is the gray Circuit Breaker that's manufactured in Canada legitimately under that trademark. Yes. Was sent to some distributor who then brought it into the United States and is competing against your black one. Exactly. They're identical in the sense that they're manufactured. Forget about quality for a second, but they're identical because they have the same specifications. I guess they're manufactured in the same UL specifications. No, they're not. The specifications for the Canadian Circuit Breakers are not UL. They're CSA, Canadian Standards Association. They're functionally equivalent. But you stipulated the functional equivalent. Yes. So now the question that I got wandering around was your ability, being it came in on the gray market and they're substantially the same, your ability to use your trademark product against you. And could you explain that? And this is that territorial thing. Yes. That's where I focused on when I was trying to sort through this. Right. The distinction is in the gray market products, the party seeking to enforce its rights owns and controls both trademarks. It's trying to restrict competition in the United States. For example, the same company owns the trademark in the United States. It produces a line of products that are sold in Argentina. They're sold in Argentina. A middleman buys them, brings them back in the U.S. I understand that one, yeah. That's the distinction. Here we have two different companies owning the identical trademark in different markets. Each is lawfully entitled to the exclusive use of its trademark in that market. A federal pioneer respects that right. Organ breakers did not. What happened here was that in 1997, organ breakers began buying these gray circuit breakers from two Canadian middlemen who obtained them through sources in Canada that were really not disclosed. American circuit breaker filed an infringement action and moved for summary judgment. The district court, in denying a summary judgment, erroneously treated this case as one involving gray market products and applied this concept of genuine goods which was developed in a gray market context, but we submit is irrelevant in a conventional infringement product case like this one. And I think the Court understands, based on previous submission, what the difference is between conventional infringement and gray market. So I won't spend any more time on that except simply to note that the principal difference here is that, unlike a gray markets case, American circuit breaker does not control the nature and quality of the gray Canadian breakers, has no right to do it, and, in fact, does not do it. So while the concept of genuine goods. And in that point, the lack of control, which I guess you can divine from the contracts, but is that also in the stipulated facts or the judge's opinion and order? Is what fact? That American circuit breaker doesn't control the Canadian manufacture of goods. The statement you just made, you said unlike a gray market. I'm not certain off the top of my head whether it is in the opinion, but it certainly is part of the record. There are statements to that effect set forth in the uncontested declaration of Robert Steele, who was the plaintiff's American circuit breaker's principal witness. As I indicated earlier, American circuit breaker's registration is incontestable. That incontestable status is conclusive evidence of an exclusive right to use. The district court eviscerated that exclusive right by finding that the gray stay of were genuine, a concept taken from a wholly different body of law and does not infringe. And the basis for this was the legally erroneous conclusion that these products have the same source. As I indicated earlier in the Monte Carlo case, source does not designate the physical place or the identity of the company who manufactures the product. It identifies the owner of the trademark, and that is true as indicated in the Monte Carlo case. The district court placed heavy emphasis on Monte Carlo and similar cases for this proposition that if there are no essential differences between the products, then they're genuine and there's no liability for infringement. But if you look at the facts, we see it's a different situation. The defendant in Monte Carlo produced the shirts for the plaintiff according to the plaintiff's specifications. The plaintiff refused to accept delivery of one shipment of shirts because they were late, too late for the Christmas season. The defendant then sold those shirts to another party. They were essentially identical. The court found that they were genuine. Here, Oregon Breakers is not selling authentic black Stablock circuit breakers that American Circuit Breaker refused to accept. It's selling gray circuit breakers intended for the Canadian market that were not produced. Maybe that's where the confusion comes. Pardon? That's where the confusion comes, gray, gray market, black, everything. Yes. You got kind of mushed up here. I think it's unfortunate that the color gray may have subconsciously led the court into thinking that this was a gray markets product. In our brief, we pointed out that one of the policy considerations underlying Federal trademark law is the protection of the trademark owner's goodwill and his investment in the mark. We submit that this decision here is inconsistent with that fundamental policy objective because yes. Let me ask you a question. You know, I haven't really seen a case like this before. Nor have I. Because, well, because of the way trademarks are usually organized worldwide, you don't have very many where they've, you know, gone down the path, split up, and you've got cross-border legitimate trademarks. So I guess that was really my question. Is there any other case you've found in the precedent that is this case? The other cases involving the territoriality of trademark rights involve parallel situations where two different companies own the same trademark in different countries, and those cases are referred to in our brief. But they're not factually on all fours with this one. Thank you. Do you want to say, ask your question, and then do you want to save some time? No, I don't have a question. Thank you. I would like to try to get through with it, and I don't think I'm going to be able to save any time for it.  That's fine. I'll try and get through just the last part of this. We submit that the district court here committed error in failing to grant summary judgment, that there were no genuine issues of material fact with respect to the two elements that the plaintiff needs to prove, which are the validity, that it owns a valid trademark, and that confusion is likely. Because the marks are identical and the products are identical, this is as close to a per se case of infringement as I have seen. And it, I think, falls within the footnote in the entrepreneur media case that's referred to in our brief. Notwithstanding the per se characteristics of this, we did include an analysis of the sleek craft confusion factors in our brief. I think that the principal ones that establish that confusion is likely are the identity of the marks, the identity of the products, the fact that these are sold through the same channels of trade. Let me ask you on this. Yes. We can uphold the Court on any ground, but let's just say we agreed with you that the Court had confused the gray market situation. Wouldn't we have to send it back for the district court then to make its determination given that understanding of the law? The determination as to liability for conventional infringement? Right. I would be with, obviously, within the Court's power to do so. I do so. I don't think it's necessary because of the confusion factors that are controlling and dispositive in this situation. No, I understand that, but we would then be making that judgment as a matter of law on appeal. Except there are no genuine issues of material fact with respect to any of those elements, so I think that the Court can make that determination on appeal. I would like just to close, and I think I am out of time. May I have 30 seconds? You may. Thank you. One of the arguments presented on appeal by the defendants is that we are the plaintiff is not entitled to recover compensatory damages without some showing of intentional infringement. The law that is relied on for this deals with the, and this would be Lindy Penn and the Mayor Brewing Company case, Ninth Circuit cases, deals exclusively with the equitable remedy of an accounting of the defendant's profits, which is equitable in origin. It's based on an unjust enrichment theory. It is not the same remedy as an accounting, as compensatory damages, which is intended to compensate the plaintiff and make the plaintiff whole. These are a legal remedy versus an equitable remedy, and the equitable considerations really don't come into play. The organ breakers here argues that it is an innocent infringer and should have no monetary consequences to its conduct, and that an injunction satisfies the equities. I respectfully submit that an injunction in this situation would simply be a slap on the wrist. They've already stopped selling this product. They've reaped the gain. As between the plaintiff and the defendant in this situation, I think the greater equity lies with the plaintiff. And I would like to close with what I think is a very apt comment by this Court in the DreamWorks case, footnote 12, and this is 142, Fed 3rd, 1127. It says, absence of malice is no defense to trademark infringement. In Through the Looking Glass, we are told that the walrus shed copious tears as he devoured the innocent oysters who had accepted his invitation to stroll along the beach. He meant them no harm, of course. He merely wished to eat them. In this situation, organ breakers obviously meant no harm. All they wanted to do was to make a profit at American Circuit breakers' expense by selling the identical product under a trademark as to which American Circuit breaker has as an established Federal law an exclusive right to use. I think under the circumstances, a reversal is required. Thank you, Your Honor. May it please the Court. Good afternoon. My name is Todd VanRyselburg, and I represent organ breakers, the defendant in this case. I submit to you that when a trademark is lawfully applied to a good and those goods are put in the stream of commerce, that they take on a life of their own. The goods might wind up down the street, across town, or even across the ocean, and problems arise, as this case illustrates, when those goods reach a territory, the territory of another. And then that brings us to a question. What law controls when both parties are trying to rightfully market their product under an appropriate trademark and they clash in one jurisdiction? I'm still a little loose on that because I'm not too sure, from counsel's argument we just heard, that I'm quite clear on what the absolute law is. When you're marketing your product, you bought it in Canada. It's pure. We've stipulated it's genuine. So what law do we look to? Point us to your best argument on that. Well, I would answer that by saying you apply the law of the circuit, which is the NEC case, Monte Carlo case, which is what the district court did. But the Monte Carlo case, see, that's what bothers me. The Monte Carlo case was Monte Carlo shirts, only one shirt, and it could have been marketed through Monte Carlo, but because they rejected it, it was marketed by the manufacturer. In this case, what's confusing with me is you have the same product. It's a circuit breaker. One's black, one's gray. It's been stipulated that they're both substantially the same. But it isn't the same circuit breaker. It's the black variety, which has one trademark. It has the yellow, the gray variety, which is not a trademark for another country, and that's when they merge. I think there's a difference. I don't think Monte Carlo, I'll go along with you that you're saying that there's some law there, but I don't know how it applies. I think Judge McKeon already wandered into this. Is that your best authority? Well, the authority is found in that case. I would agree with you. Well, tell me what the authority is, because factually we're going to have to distinguish it. We're going to have to say that we're going to apply Monte Carlo because, and then you're going to have to fill in the blank part. Sure. Well, I have a passage in mind, and I can't put my finger on it, but it's the same passage that you see or will see in all of these cases, which is a threshold. It's an authority that says that the plaintiff has to show that these goods are non-genuine. That's a threshold standard, I guess, in every case. You'll see that in the NEC case. You'll see it mentioned in the Monte Carlo case. You'll see it mentioned in the – in the – That's kind of – well, go ahead. No, go on. You know, I – analytically, that seems to put the cart before the horse in terms of determining what do we have here. I mean, I kind of went down the gray market path and tried to analyze the case like that, like the district court, and I, you know, kept having conceptual problems. And the reason I kept thinking that is because, you know, it's not really a gray market case. It's like if – if I have a trademark for black robes, and it's an incontestable trademark in the United States, whether you have a trademark – whether there's a trademark in Canada or anywhere else, if somebody is selling goods in the United States that are black robes and are materially indistinguishable from my products, why isn't it just a straight-up trademark infringement case? Well, because in a more ordinary case, there's going to be – it's going to be very easy to show that the goods are not genuine because they're going to be – they're going to have material differences. And that's why you don't see this sort of thing there. No, no, no. But see, we have a lot of – that's exactly what – if – what – that's usually what you have in a trademark case is that the goods are so close that the consumers think it's from this source. I mean, that – if you don't have them close enough, then you don't win, so goodbye. But when you win, they're either pretty close or virtually identical. You know, they're knockoffs sometimes, you know, manufactured in the United States, leaving aside the foreign things. So the fact that the genuineness here relates to how – you know, do they basically look and act the same? And the answer is yes, right? Correct. There's no disagreement between the parties. So what good is their U.S. trademark? Well, you have to look at the purpose of the Lanham Act and what purpose it serves. And this is found in those same authorities. Right. The purpose is twofold. First, it's to make sure that the consumer gets what the consumer was expecting to get, that protects the consumer. And second, that it protects the goodwill, not the right to profit by the trademark owner, but the goodwill that may have been developed in that particular product. Right. And the goodwill that they have in the United – is, you know, it's bounded by the United States meets and bounds. That's their goodwill range, if you will. And that's what they're trying to protect. So when you bring – when you basically go head-to-head competition using the same trademark, I'm at a loss to know why – and I don't know if they – you know, whether they could win here or not, but why isn't that just trademark infringement? Because it doesn't – it has no consequence to the goodwill. It doesn't – it doesn't degrade from the goodwill that the – that the public might have or the esteem that the public might have in that product. And you can look at your damages. I mean, that's – see, now I think we're mixing liability under an incontestable mark with, you know, maybe there's no damages. I don't have any. I have no idea. But I'm just hypothetically thinking you could say, well, there's really no goodwill diminished. And they would say, as in many trademark cases, of course, goodwill relates to sales and blah, blah, blah, a lot of other things. So I don't think you can say it's the goodwill factor. The real question is this really isn't a gray market situation where it's an authorized product and then it just comes into the U.S. And companies have been stymied by that for years. And we say, well, sorry, there's just no trademark infringement. Well, I respectfully disagree, but let me try to explain why. Okay. So let me tell me – tell me why it's a gray market. Well, what we're talking about here is this – Tell me why it's a gray market analysis because we only have kind of two choices. We've either got gray market or regular old trademark infringement. Yeah. The – I think the way I would answer that is that the – I hope I get to the answer. But is that – Well, you can start with the answer. That would be one way to do it. Well, the problem, I think, with the plaintiff's approach to this case is that it requires the court to take a look at it and try to classify it based upon a variety of cases. And we have not reached the full extent of those cases. We're going to have – there's going to be an infinite number of those cases. And none of those cases out there right now profess to represent or describe all the possibilities. If you wanted to proceed with that approach, though, you would find that – you might find that in one of the leading cases, the Kmart case, the Supreme Court case, it talks about three different classes or types of these cases. And this case falls very closely to the third category. And, by the way, that case didn't pretend or suggest that that represents all of the cases. So it just describes how these cases can come up. And, incidentally, the ability to control the trade or the interdependence between the parties on both sides of the border is only represented in one of those three categories. And that brings me to another question. Did ACBC actually create their own problem in this respect? If you create two – and does the stipulation come into this? When you start stipulating that the two products are substantially the same and they're genuine and you put them in two markets that are going to intersect whether you like it or not and you don't control it by contract, you're asking for trouble. In other words, if I contract with Canada folks to build them and I sell my ability to control the process, I should say to Canada, if you let this out in the open market, you agree that you're going to pay me royalties because you're going to start flooding my market. They didn't do that. Absolutely. And so are we now trying to use – because they set up this sort of inconsistency because this market's going to get loose. It's a wild animal. But it's a real animal and everybody agrees it's okay. Then that brings down to the stipulation on only one issue, control of quality. How does control of quality come into this equation? Because suppose the quality of this gray product slips. Now does that – and does the stipulation take care of that or does it confuse – Well, the stipulation takes care of it from my perspective. Tell me how, please. Genuineness. Genuineness. They stipulated that the products are genuine. The determination of whether a product is genuine is based upon whether there's any material difference. Are the two products the same basically? That's part of it. I'm talking about quality. I know. Suppose that in Canada, you know, on Friday they all go to the parlor and watch hockey. So on Friday all those things are coming off, all the gray ones are kind of cockeyed. And so they're saying, no, we don't do that to our black ones. And so does that get into this? Getting to that, I'm sorry, but the second part of that is, again, resolved by the genuine stipulation. If you look at the Iberia case, there was some discussion about whether the lack of quality control somehow created a material difference between the two products. The court determined in that case, the Second Circuit decided, that the quality control measures that were employed by the plaintiff in that case were not substantial enough to lead to a material difference. Therefore, products are genuine. In this case, before you, we've already agreed that the products are genuine. So any concerns about quality control or anything like that have been resolved by that stipulation. You know, but under your analysis, as long as somebody manufactured an identical product for which there was no distinction, you could basically sell it under somebody else's trademark. No. That is the plaintiff's argument. That would be your argument, because what would prevent someone from doing that if it's not trademark infringement? Very simply. First of all, I could not simply set up a shop and do that, and as long as I make that product identical to Mr. Cooper's client's product, I couldn't do that because I wouldn't be able to lawfully apply the mark. In Canada, you can. But you can only lawfully apply the mark in Canada. Yes. And then it's Canadian trademark. Right. There is not a valid U.S. trademark on those goods that are the, you know, you have to think about the color, the gray color in Canada. There's no U.S. valid trademark on those, correct? There is. I mean, that's really the nut of the issue. And this is my point of view that I'm trying to make clear to you, is that there's no issue that Federal Pioneer had the authority to put that mark on every breaker that it made, whether it sold one breaker or all the breakers to American Circuit breakers. It had authority to put the mark on that. But once that mark was put on that product and put into the stream of commerce, they, as I said in the beginning, they take on a life of their own. Now, the trouble. See, they don't really take on a life of their own, you see, because they're not, they do, but the people distributing them don't. See, that seems to me to be the difference. They just wander around into the, they cross the border indiscriminately, these things. But if you're the person that's selling them, then the question is, in effect, you're misrepresenting the trademark ownership. That's really the issue. Well, let me point out one potential problem that I see with this concept that I don't believe is supported in any case, any case cited by counsel, but it appears in the reply brief in two different places, and that is that this genuineness can go away as soon as it crosses a border. And the problem with that is that who is to know? Who is to know when they look at a product? For example, how is my client supposed to know? When this Canadian wholesaler contacted him and offered to sell these circuit breakers, and my client saw the very same breakers, Federal Pioneer breakers, on the shelf at Home Depot, how is he supposed to know that somehow this genuineness became invalid or the trademark became invalid? It doesn't offer a very workable system. The cases that I, that we've referred you to seem to have a way of dealing with that, which brings, which gives some attention to the purpose of the Lanham Act. It disregards that, I mean, it simply just focuses on did the customer get what the customer was supposed to get, and if they were genuine, assuming they're genuine, that did not detract from the good, the esteem that is associated with those breakers. That's not to say that there are not other remedies available. There's, of course, remedies under the Tariff Act. There could be contractual remedies. I would like to offer a very simple suggestion, and this is to take, to go a step further from Your Honor's question about creating the situation, is that American circuit breakers should have had some notion that these products, that the circuit breakers that are going to continue to be made by the Canadian company are going to continue to flow. And they could have, as anybody in their situation, when they entered into this relationship, could have required manufacture of a product that has a material difference. Simple as that. And I would leave it up to the engineers or somebody to come up with what that difference would be. But if there's a material difference between the circuit breakers that are purchased by American circuit breakers and the circuit breakers that are manufactured by the Canadian, by Federal Pioneer, problem solved. And also then we don't have a problem with the innocent people downstream who don't know about whether something's going to become invalid just because it's crossing a border or has it gone back and forth. I mean, it's just not workable. Not really. I mean, isn't the solution for the so-called innocent people for them to say, look, we have the exclusive trademark in the United States, so therefore we control source and distribution in the United States, and I'm sorry you're violating it, end of story. Now you have notice. I mean, so at that point you're no longer an innocent distributor, correct? Well, I'm not sure. Maybe I wasn't listening carefully enough, but I'm not sure if that's really the way things work. Well, yeah, it is. That's why people send cease and desist letters, because they find all kinds of innocent people using their trademark sometimes. Does the trademark right give the appellant an exclusive right to market the trademark goods with that trademark in the U.S.? Yes. Okay, so maybe I'm looking at this too simplistically, but why wouldn't it be that if Oregon Breakers is marketing the trademark goods, and they don't have the sanction of the appellant's trademark, that Oregon Breakers is offending the trademark law and may have recourse against its supplier? Maybe it should have asked its supplier for a warranty. Why isn't it just a trademark violation? Well, it's because, as I understand it, it has to do with the scope of the Lanham Act. And, you know, this is not a claim. You say the Lanham Act is designed to protect against counterfeit goods or inferior goods with the mark or different goods, but, like, this is the real thing, just from the other countries. If I'm following correctly, yes, certainly the Lanham Act would protect from the sale of black market goods or counterfeit goods. We're not dealing with that in this case. It's something different. The point is that there's no precedent one way or the other that says whether the Lanham Act protects against someone with a valid extraterritorial trademark, you know, the trademark in a different jurisdiction marketing it into the U.S.? Well, I think that's what the cases, again, if I'm following you, that's what I think the cases that we've cited say, is that when you have that kind of a situation, this is how we deal with it. Let's say they were manufactured in the United States or Canada. Your client got some of those. Would you go under gray market or would you go under trademark analysis? Okay. So just so I'm following, if, let's say, something fell off the truck? No. It's just that everything didn't fall off the truck. Everything is in the United States to start with, correct? It's your hypothetical. That's fine. My hypothetical. So everything is manufactured here. Okay. And then you get some of that because somebody sells you some of it. And you sell it under American Circuit Breaker or STAB lock. I guess it is STAB lock. Is that trademark violation? Well, it's not that simple. I'd have to ask who manufactured it and were there any material differences between the products and those sorts of things. But it is simple because that's exactly what happened here and the parties didn't control it. It started because the American company not only owned the trademark and manufactured, but then they manufactured for their subsidiary in Canada. That's how they controlled the market flow. They sold the subsidiary to a separate company and then sold the manufacturing to Canada so you unloosed the giant. But they're selling the same product. And, as you said, it may not be a Lanhamac thing. I'm going to look into that. They have a problem because of the way they structured their manufacturing and distribution. It may not be a Lanhamac. They're trying a collateral attack with the Lanhamac, if you're right. You presented an interesting case. Your time is up, as the other counsel. The case of American Circuit Breaker v. Oregon Breakers is submitted. Thank you both for your argument, and we're concluded for the morning. Thank you.
judges: Brunetti, McKeown, Gould